(Slip Opinion)   OCTOBER TERM, 2010   1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## J. MCINTYRE MACHINERY, LTD. *v.* NICASTRO, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF NICASTRO

### CERTIORARI TO THE SUPREME COURT OF NEW JERSEY

No. 09–1343.   Argued January 11, 2011—Decided June 27, 2011

Respondent Nicastro injured his hand while using a metal-shearing machine that petitioner J. McIntyre Machinery, Ltd. (J. McIntyre), manufactured in England, where the company is incorporated and operates.  Nicastro filed this products-liability suit in a state court in New Jersey, where the accident occurred, but J. McIntyre sought to dismiss the suit for want of personal jurisdiction.  Nicastro's jurisdictional claim was based on three primary facts: A U. S. distributor agreed to sell J. McIntyre's machines in this country; J. McIntyre officials attended trade shows in several States, albeit not in New Jersey; and no more than four J. McIntyre machines (the record suggests only one), including the one at issue, ended up in New Jersey.  The State Supreme Court held that New Jersey's courts can exercise jurisdiction over a foreign manufacturer without contravening the Fourteenth Amendment's Due Process Clause so long as the manufacturer knew or reasonably should have known that its products are distributed through a nationwide distribution system that might lead to sales in any of the States.  Invoking this "stream-of-commerce" doctrine of jurisdiction, the court relied in part on *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102.  Applying its test, the court concluded that J. McIntyre was subject to jurisdiction in New Jersey, even though at no time had it advertised in, sent goods to, or in any relevant sense targeted the State.

*Held:* The judgment is reversed.

201 N. J. 48, 987 A. 2d 575, reversed.

   JUSTICE KENNEDY, joined by THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS, concluded that because J. McIntyre never en-

gaged in any activities in New Jersey that revealed an intent to invoke or benefit from the protection of the State's laws, New Jersey is without power to adjudge the company's rights and liabilities, and its exercise of jurisdiction would violate due process. Pp. 4–12.

(a) Due process protects the defendant's right not to be coerced except by lawful judicial power. A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316. Freeform fundamental fairness notions divorced from traditional practice cannot transform a judgment rendered without authority into law. As a general rule, the sovereign's exercise of power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson* v. *Denckla*, 357 U. S. 235, 253. In cases like this one, it is the defendant's purposeful availment that makes jurisdiction consistent with "fair play and substantial justice" notions. No "stream-of-commerce" doctrine can displace that general rule for products-liability cases.

The rules and standards for determining state jurisdiction over an absent party have been unclear because of decades-old questions left open in *Asahi.* The imprecision arising from *Asahi*, for the most part, results from its statement of the relation between jurisdiction and the "stream of commerce." That concept, like other metaphors, has its deficiencies as well as its utilities. It refers to the movement of goods from manufacturers through distributors to consumers, yet beyond that descriptive purpose its meaning is far from exact. A defendant's placement of goods into commerce "with the expectation that they will be purchased by consumers within the forum State" may indicate purposeful availment. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 298. But that does not amend the general rule of personal jurisdiction. The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign. See, *e.g., Hanson*, *supra*, at 253. In *Asahi*, Justice Brennan's concurrence (joined by three other Justices) discarded the central concept of sovereign authority in favor of fairness and foreseeability considerations on the theory that the defendant's ability to anticipate suit is the touchstone of jurisdiction. 480 U. S., at 117. However, Justice O'Connor's lead opinion (also for four Justices) stated that "[t]he 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State." *Id.,* at 112. Since *Asahi,* the courts

have sought to reconcile the competing opinions. But Justice Brennan's rule based on general notions of fairness and foreseeability is inconsistent with the premises of lawful judicial power under this Court's precedents. Today's conclusion that the authority to subject a defendant to judgment depends on purposeful availment is consistent with Justice O'Connor's *Asahi* opinion. Pp. 4–10.

(b) Nicastro has not established that J. McIntyre engaged in conduct purposefully directed at New Jersey. The company had no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to, the State. Indeed, the trial court found that petitioner did not have a single contact with the State apart from the fact that the machine in question ended up there. Neither these facts, nor the three on which Nicastro centered his jurisdictional claim, show that J. McIntyre purposefully availed itself of the New Jersey market. Pp. 10–12.

JUSTICE BREYER, joined by JUSTICE ALITO, agreed that the New Jersey Supreme Court's judgment must be reversed, but concluded that because this case does not present issues arising from recent changes in commerce and communication, it is unwise to announce a rule of broad applicability without fully considering modern-day consequences. Rather, the outcome of the case is determined by the Court's precedents. Pp. 2–7.

(a) Based on the record, respondent Nicastro failed to meet his burden to demonstrate that it was constitutionally proper to exercise jurisdiction over petitioner J. McIntyre Machinery, Ltd. (British Manufacturer). The three primary facts the state high court relied on do not satisfy due process. None of the Court's precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. See *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286; *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102. Here, the relevant facts show no "regular . . . flow" or "regular course" of sales in New Jersey, *id.,* at 117 (Brennan, J., concurring in part and concurring in judgment); *id.,* at 122 (Stevens, J., concurring in part and concurring in judgment); and there is no "something more," such as special state-related design, advertising, advice, or marketing, *id.,* at 111, 112 (opinion of O'Connor, J.), that would warrant the assertion of jurisdiction. Nicastro has shown no specific effort by the British Manufacturer to sell in New Jersey. And he has not otherwise shown that the British Manufacturer "'purposefully avail[ed] itself of the privilege of conducting activities'" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users. *World-Wide Volkswagen, supra*, at 297–298. Pp. 2–4.

Syllabus

(b) JUSTICE BREYER would not go further. Because the incident at issue does not implicate modern concerns, and because the factual record leaves many open questions, this is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules. At a minimum, he would not work such a change to the law in the way either the plurality or the New Jersey Supreme Court suggests without a better understanding of the relevant contemporary commercial circumstances. Insofar as such considerations are relevant to any change in present law, they might be presented in a case (unlike the present one) in which the Solicitor General participates. Pp. 4–7.

KENNEDY, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and SCALIA and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in the judgment, in which ALITO, J., joined. GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 09–1343

———

## J. McINTYRE MACHINERY, LTD., PETITIONER *v.* ROBERT NICASTRO, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ROSEANNE NICASTRO

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEW JERSEY

[June 27, 2011]

JUSTICE KENNEDY announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join.

Whether a person or entity is subject to the jurisdiction of a state court despite not having been present in the State either at the time of suit or at the time of the alleged injury, and despite not having consented to the exercise of jurisdiction, is a question that arises with great frequency in the routine course of litigation. The rules and standards for determining when a State does or does not have jurisdiction over an absent party have been unclear because of decades-old questions left open in *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102 (1987).

Here, the Supreme Court of New Jersey, relying in part on *Asahi*, held that New Jersey's courts can exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer "knows or reasonably should know that its products are distributed through a nationwide distribu-

tion system that might lead to those products being sold in any of the fifty states." *Nicastro* v. *McIntyre Machinery America, Ltd.*, 201 N. J. 48, 76, 77, 987 A. 2d 575, 591, 592 (2010). Applying that test, the court concluded that a British manufacturer of scrap metal machines was subject to jurisdiction in New Jersey, even though at no time had it advertised in, sent goods to, or in any relevant sense targeted the State.

That decision cannot be sustained. Although the New Jersey Supreme Court issued an extensive opinion with careful attention to this Court's cases and to its own precedent, the "stream of commerce" metaphor carried the decision far afield. Due process protects the defendant's right not to be coerced except by lawful judicial power. As a general rule, the exercise of judicial power is not lawful unless the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson* v. *Denckla*, 357 U. S. 235, 253 (1958). There may be exceptions, say, for instance, in cases involving an intentional tort. But the general rule is applicable in this products-liability case, and the so-called "stream-of-commerce" doctrine cannot displace it.

## I

This case arises from a products-liability suit filed in New Jersey state court. Robert Nicastro seriously injured his hand while using a metal-shearing machine manufactured by J. McIntyre Machinery, Ltd. (J. McIntyre). The accident occurred in New Jersey, but the machine was manufactured in England, where J. McIntyre is incorporated and operates. The question here is whether the New Jersey courts have jurisdiction over J. McIntyre, notwithstanding the fact that the company at no time either marketed goods in the State or shipped them there. Nicastro was a plaintiff in the New Jersey trial court and is

the respondent here; J. McIntyre was a defendant and is now the petitioner.

At oral argument in this Court, Nicastro's counsel stressed three primary facts in defense of New Jersey's assertion of jurisdiction over J. McIntyre. See Tr. of Oral Arg. 29–30.

First, an independent company agreed to sell J. McIntyre's machines in the United States. J. McIntyre itself did not sell its machines to buyers in this country beyond the U. S. distributor, and there is no allegation that the distributor was under J. McIntyre's control.

Second, J. McIntyre officials attended annual conventions for the scrap recycling industry to advertise J. McIntyre's machines alongside the distributor. The conventions took place in various States, but never in New Jersey.

Third, no more than four machines (the record suggests only one, see App. to Pet. for Cert. 130a), including the machine that caused the injuries that are the basis for this suit, ended up in New Jersey.

In addition to these facts emphasized by respondent, the New Jersey Supreme Court noted that J. McIntyre held both United States and European patents on its recycling technology. 201 N. J., at 55, 987 A. 2d, at 579. It also noted that the U. S. distributor "structured [its] advertising and sales efforts in accordance with" J. McIntyre's "direction and guidance whenever possible," and that "at least some of the machines were sold on consignment to" the distributor. *Id.*, at 55, 56, 987 A. 2d, at 579 (internal quotation marks omitted).

In light of these facts, the New Jersey Supreme Court concluded that New Jersey courts could exercise jurisdiction over petitioner without contravention of the Due Process Clause. Jurisdiction was proper, in that court's view, because the injury occurred in New Jersey; because petitioner knew or reasonably should have known "that its

products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states"; and because petitioner failed to "take some reasonable step to prevent the distribution of its products in this State." *Id.*, at 77, 987 A. 2d, at 592.

Both the New Jersey Supreme Court's holding and its account of what it called "[t]he stream-of-commerce doctrine of jurisdiction," *id.*, at 80, 987 A. 2d, at 594, were incorrect, however. This Court's *Asahi* decision may be responsible in part for that court's error regarding the stream of commerce, and this case presents an opportunity to provide greater clarity.

## II

The Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power. Cf. *Giaccio* v. *Pennsylvania*, 382 U. S. 399, 403 (1966) (The Clause "protect[s] a person against having the Government impose burdens upon him except in accordance with the valid laws of the land"). This is no less true with respect to the power of a sovereign to resolve disputes through judicial process than with respect to the power of a sovereign to prescribe rules of conduct for those within its sphere. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94 (1998) ("Jurisdiction is power to declare the law"). As a general rule, neither statute nor judicial decree may bind strangers to the State. Cf. *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 608–609 (1990) (opinion of SCALIA, J.) (invoking "the phrase *coram non judice,* 'before a person not a judge'—meaning, in effect, that the proceeding in question was not a *judicial* proceeding because lawful judicial authority was not present, and could therefore not yield a *judgment*")

A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign

"such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316 (1945) (quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940)). Freeform notions of fundamental fairness divorced from traditional practice cannot transform a judgment rendered in the absence of authority into law. As a general rule, the sovereign's exercise of power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson*, 357 U. S., at 253, though in some cases, as with an intentional tort, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws. In products-liability cases like this one, it is the defendant's purposeful availment that makes jurisdiction consistent with "traditional notions of fair play and substantial justice."

A person may submit to a State's authority in a number of ways. There is, of course, explicit consent. *E.g.*, *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 703 (1982). Presence within a State at the time suit commences through service of process is another example. See *Burnham*, *supra*. Citizenship or domicile—or, by analogy, incorporation or principal place of business for corporations—also indicates general submission to a State's powers. *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, *post*, p. \_\_. Each of these examples reveals circumstances, or a course of conduct, from which it is proper to infer an intention to benefit from and thus an intention to submit to the laws of the forum State. Cf. *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 476 (1985). These examples support exercise of the general jurisdiction of the State's courts and allow the State to resolve both matters that originate within the State and those based on activities and events elsewhere. *Helicop-*

*teros Nacionales de Colombia, S. A.* v. *Hall*, 466 U. S. 408, 414, and n. 9 (1984). By contrast, those who live or oper-ate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter.

There is also a more limited form of submission to a State's authority for disputes that "arise out of or are con-nected with the activities within the state." *International Shoe Co.*, *supra*, at 319. Where a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson*, *supra*, at 253, it submits to the judicial power of an otherwise foreign sovereign to the extent that power is exercised in connection with the defendant's activities touching on the State. In other words, submission through contact with and activity directed at a sovereign may justify specific jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros*, *supra*, at 414, n. 8; see also *Goodyear*, *post*, at 2.

The imprecision arising from *Asahi*, for the most part, results from its statement of the relation between jurisdic-tion and the "stream of commerce." The stream of com-merce, like other metaphors, has its deficiencies as well as its utility. It refers to the movement of goods from manu-facturers through distributors to consumers, yet beyond that descriptive purpose its meaning is far from exact. This Court has stated that a defendant's placing goods into the stream of commerce "with the expectation that they will be purchased by consumers within the forum State" may indicate purposeful availment. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 298 (1980) (finding that expectation lacking). But that statement does not amend the general rule of personal jurisdiction. It merely observes that a defendant may in an appropriate case be subject to jurisdiction without entering the

forum—itself an unexceptional proposition—as where manufacturers or distributors "seek to serve" a given State's market. *Id.*, at 295. The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign. In other words, the defendant must "purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson, supra,* at 253; *Insurance Corp., supra,* at 704–705 ("[A]ctions of the defendant may amount to a legal submission to the jurisdiction of the court"). Sometimes a defendant does so by sending its goods rather than its agents. The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.

In *Asahi*, an opinion by Justice Brennan for four Justices outlined a different approach. It discarded the central concept of sovereign authority in favor of considerations of fairness and foreseeability. As that concurrence contended, "jurisdiction premised on the placement of a product into the stream of commerce [without more] is consistent with the Due Process Clause," for "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." 480 U. S., at 117 (opinion concurring in part and concurring in judgment). It was the premise of the concurring opinion that the defendant's ability to anticipate suit renders the assertion of jurisdiction fair. In this way, the opinion made foreseeability the touchstone of jurisdiction.

The standard set forth in Justice Brennan's concurrence was rejected in an opinion written by Justice O'Connor; but the relevant part of that opinion, too, commanded the assent of only four Justices, not a majority of the Court.

That opinion stated: "The 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.*, at 112 (emphasis deleted; citations omitted).

Since *Asahi* was decided, the courts have sought to reconcile the competing opinions. But Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power. This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment.

The conclusion that jurisdiction is in the first instance a question of authority rather than fairness explains, for example, why the principal opinion in *Burnham* "conducted no independent inquiry into the desirability or fairness" of the rule that service of process within a State suffices to establish jurisdiction over an otherwise foreign defendant. 495 U. S., at 621. As that opinion explained, "[t]he view developed early that each State had the power to hale before its courts any individual who could be found within its borders." *Id.*, at 610. Furthermore, were general fairness considerations the touchstone of jurisdiction, a lack of purposeful availment might be excused where carefully crafted judicial procedures could otherwise protect the defendant's interests, or where the plaintiff would suffer substantial hardship if forced to litigate in a foreign forum. That such considerations have not been deemed controlling is instructive. See, *e.g.*, *World-Wide Volkswagen*, *supra*, at 294.

Two principles are implicit in the foregoing. First, personal jurisdiction requires a forum-by-forum, or sovereign-

by-sovereign, analysis. The question is whether a de-fendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that con-duct. Personal jurisdiction, of course, restricts "judicial power not as a matter of sovereignty, but as a matter of individual liberty," for due process protects the individ-ual's right to be subject only to lawful power. *Insurance Corp.*, 456 U. S., at 702. But whether a judicial judgment is lawful depends on whether the sovereign has authority to render it.

The second principle is a corollary of the first. Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State. This is consistent with the premises and unique genius of our Constitution. Ours is "a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring). For jurisdiction, a litigant may have the requisite relationship with the United States Government but not with the government of any individual State. That would be an exceptional case, however. If the defendant is a domestic domiciliary, the courts of its home State are available and can exercise general jurisdiction. And if another State were to assert jurisdiction in an inappropri-ate case, it would upset the federal balance, which posits that each State has a sovereignty that is not subject to unlawful intrusion by other States. Furthermore, foreign corporations will often target or concentrate on particular States, subjecting them to specific jurisdiction in those forums.

It must be remembered, however, that although this case and *Asahi* both involve foreign manufacturers, the undesirable consequences of Justice Brennan's approach are no less significant for domestic producers. The owner of a small Florida farm might sell crops to a large nearby distributor, for example, who might then distribute them to grocers across the country. If foreseeability were the controlling criterion, the farmer could be sued in Alaska or any number of other States' courts without ever leaving town. And the issue of foreseeability may itself be contested so that significant expenses are incurred just on the preliminary issue of jurisdiction. Jurisdictional rules should avoid these costs whenever possible.

The conclusion that the authority to subject a defendant to judgment depends on purposeful availment, consistent with Justice O'Connor's opinion in *Asahi*, does not by itself resolve many difficult questions of jurisdiction that will arise in particular cases. The defendant's conduct and the economic realities of the market the defendant seeks to serve will differ across cases, and judicial exposition will, in common-law fashion, clarify the contours of that principle.

## III

In this case, petitioner directed marketing and sales efforts at the United States. It may be that, assuming it were otherwise empowered to legislate on the subject, the Congress could authorize the exercise of jurisdiction in appropriate courts. That circumstance is not presented in this case, however, and it is neither necessary nor appropriate to address here any constitutional concerns that might be attendant to that exercise of power. See *Asahi*, 480 U. S., at 113, n. Nor is it necessary to determine what substantive law might apply were Congress to authorize jurisdiction in a federal court in New Jersey. See *Hanson*, 357 U. S., at 254 ("The issue is personal jurisdiction, not

choice of law"). A sovereign's legislative authority to regulate conduct may present considerations different from those presented by its authority to subject a defendant to judgment in its courts. Here the question concerns the authority of a New Jersey state court to exercise jurisdiction, so it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant.

Respondent has not established that J. McIntyre engaged in conduct purposefully directed at New Jersey. Recall that respondent's claim of jurisdiction centers on three facts: The distributor agreed to sell J. McIntyre's machines in the United States; J. McIntyre officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey. The British manufacturer had no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to, the State. Indeed, after discovery the trial court found that the "defendant does not have a single contact with New Jersey short of the machine in question ending up in this state." App. to Pet. for Cert. 130a. These facts may reveal an intent to serve the U. S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market.

It is notable that the New Jersey Supreme Court appears to agree, for it could "not find that J. McIntyre had a presence or minimum contacts in this State—in any jurisprudential sense—that would justify a New Jersey court to exercise jurisdiction in this case." 201 N. J., at 61, 987 A. 2d, at 582. The court nonetheless held that petitioner could be sued in New Jersey based on a "stream-of-commerce theory of jurisdiction." *Ibid.* As discussed, however, the stream-of-commerce metaphor cannot supersede either the mandate of the Due Process Clause or the limits on judicial authority that Clause ensures. The New Jersey Supreme Court also cited "significant policy rea-

sons" to justify its holding, including the State's "strong interest in protecting its citizens from defective products." *Id.*, at 75, 987 A. 2d, at 590. That interest is doubtless strong, but the Constitution commands restraint before discarding liberty in the name of expediency.

*      *      *

Due process protects petitioner's right to be subject only to lawful authority. At no time did petitioner engage in any activities in New Jersey that reveal an intent to invoke or benefit from the protection of its laws. New Jersey is without power to adjudge the rights and liabilities of J. McIntyre, and its exercise of jurisdiction would violate due process. The contrary judgment of the New Jersey Supreme Court is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–1343

_____

## J. McINTYRE MACHINERY, LTD., PETITIONER *v.* ROBERT NICASTRO, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ROSEANNE NICASTRO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEW JERSEY

[June 27, 2011]

JUSTICE BREYER, with whom JUSTICE ALITO joins, concurring in the judgment.

The Supreme Court of New Jersey adopted a broad understanding of the scope of personal jurisdiction based on its view that "[t]he increasingly fast-paced globalization of the world economy has removed national borders as barriers to trade." *Nicastro* v. *McIntyre Machinery America, Ltd.,* 201 N. J. 48, 52, 987 A. 2d 575, 577 (2010). I do not doubt that there have been many recent changes in commerce and communication, many of which are not anticipated by our precedents. But this case does not present any of those issues. So I think it unwise to announce a rule of broad applicability without full consideration of the modern-day consequences.

In my view, the outcome of this case is determined by our precedents. Based on the facts found by the New Jersey courts, respondent Robert Nicastro failed to meet his burden to demonstrate that it was constitutionally proper to exercise jurisdiction over petitioner J. McIntyre Machinery, Ltd. (British Manufacturer), a British firm that manufactures scrap-metal machines in Great Britain and sells them through an independent distributor in the United States (American Distributor). On that basis, I

agree with the plurality that the contrary judgment of the Supreme Court of New Jersey should be reversed.

## I

In asserting jurisdiction over the British Manufacturer, the Supreme Court of New Jersey relied most heavily on three primary facts as providing constitutionally sufficient "contacts" with New Jersey, thereby making it fundamentally fair to hale the British Manufacturer before its courts: (1) The American Distributor on one occasion sold and shipped one machine to a New Jersey customer, namely, Mr. Nicastro's employer, Mr. Curcio; (2) the British Manufacturer permitted, indeed wanted, its independent American Distributor to sell its machines to anyone in America willing to buy them; and (3) representatives of the British Manufacturer attended trade shows in "such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco." *Id.,* at 54–55, 987 A. 2d, at 578–579. In my view, these facts do not provide contacts between the British firm and the State of New Jersey constitutionally sufficient to support New Jersey's assertion of jurisdiction in this case.

None of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient. Rather, this Court's previous holdings suggest the contrary. The Court has held that a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction. See *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286 (1980). And the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place. See *Asahi Metal*

*Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480
U. S. 102, 111, 112 (1987) (opinion of O'Connor, J.) (requir-
ing "something more" than simply placing "a product
into the stream of commerce," even if defendant is "awar[e]"
that the stream "may or will sweep the product into the
forum State"); *id.,* at 117 (Brennan, J., concurring in part
and concurring in judgment) (jurisdiction should lie where
a sale in a State is part of "the regular and anticipated
flow" of commerce into the State, but not where that sale
is only an "edd[y]," *i.e.*, an isolated occurrence); *id.,* at 122
(Stevens, J., concurring in part and concurring in judg-
ment) (indicating that "the volume, the value, and the
hazardous character" of a good may affect the jurisdic-
tional inquiry and emphasizing Asahi's "regular course of
dealing").

Here, the relevant facts found by the New Jersey Su-
preme Court show no "regular . . . flow" or "regular course"
of sales in New Jersey; and there is no "something more,"
such as special state-related design, advertising, advice,
marketing, or anything else. Mr. Nicastro, who here bears
the burden of proving jurisdiction, has shown no specific
effort by the British Manufacturer to sell in New Jersey.
He has introduced no list of potential New Jersey custom-
ers who might, for example, have regularly attended trade
shows. And he has not otherwise shown that the British
Manufacturer "purposefully avail[ed] itself of the privilege
of conducting activities" within New Jersey, or that it de-
livered its goods in the stream of commerce "with the
expectation that they will be purchased" by New Jersey
users. *World-Wide Volkswagen, supra*, at 297–298 (inter-
nal quotation marks omitted).

There may well have been other facts that Mr. Nicastro
could have demonstrated in support of jurisdiction. And
the dissent considers some of those facts. See *post*, at 3
(opinion of GINSBURG, J.) (describing the size and scope
of New Jersey's scrap-metal business). But the plaintiff

bears the burden of establishing jurisdiction, and here I would take the facts precisely as the New Jersey Supreme Court stated them. *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 709 (1982); *Blakey* v. *Continental Airlines, Inc.*, 164 N. J. 38, 71, 751 A. 2d 538, 557 (2000); see 201 N. J., at 54–56, 987 A. 2d, at 578–579; App. to Pet. for Cert. 128a–137a (trial court's "reasoning and finding(s)").

Accordingly, on the record present here, resolving this case requires no more than adhering to our precedents.

## II

I would not go further. Because the incident at issue in this case does not implicate modern concerns, and because the factual record leaves many open questions, this is an unsuitable vehicle for making broad pronouncements that refashion basic jurisdictional rules.

## A

The plurality seems to state strict rules that limit jurisdiction where a defendant does not "inten[d] to submit to the power of a sovereign" and cannot "be said to have targeted the forum." *Ante*, at 7. But what do those standards mean when a company targets the world by selling products from its Web site? And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders? And what if the company markets its products through popup advertisements that it knows will be viewed in a forum? Those issues have serious commercial consequences but are totally absent in this case.

## B

But though I do not agree with the plurality's seemingly strict no-jurisdiction rule, I am not persuaded by the absolute approach adopted by the New Jersey Supreme

Court and urged by respondent and his *amici*. Under that view, a producer is subject to jurisdiction for a products-liability action so long as it "knows or reasonably should know that its products are distributed through a nation-wide distribution system that *might* lead to those products being sold in any of the fifty states." 201 N. J., at 76–77, 987 A. 2d, at 592 (emphasis added). In the context of this case, I cannot agree.

For one thing, to adopt this view would abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum,* and the litigation," it is fair, in light of the defendant's contacts *with that forum*, to subject the defendant to suit there. *Shaffer* v. *Heitner*, 433 U. S. 186, 204 (1977) (emphasis added). It would ordinarily rest jurisdiction instead upon no more than the occurrence of a product-based accident in the forum State. But this Court has rejected the notion that a defendant's amenability to suit "travel[s] with the chattel." *World-Wide Volkswagen*, 444 U. S., at 296.

For another, I cannot reconcile so automatic a rule with the constitutional demand for "minimum contacts" and "purposefu[l] avail[ment]," each of which rest upon a particular notion of defendant-focused fairness. *Id.,* at 291, 297 (internal quotation marks omitted). A rule like the New Jersey Supreme Court's would permit every State to assert jurisdiction in a products-liability suit against any domestic manufacturer who sells its products (made anywhere in the United States) to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum at issue. What might appear fair in the case of a large manufac-turer which specifically seeks, or expects, an equal-sized distributor to sell its product in a distant State might seem unfair in the case of a small manufacturer (say, an Appalachian potter) who sells his product (cups and sau-

cers) exclusively to a large distributor, who resells a single item (a coffee mug) to a buyer from a distant State (Hawaii). I know too little about the range of these or in-between possibilities to abandon in favor of the more absolute rule what has previously been this Court's less absolute approach.

Further, the fact that the defendant is a foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute rule yet more uncertain. I am again less certain than is the New Jersey Supreme Court that the nature of international commerce has changed so significantly as to require a new approach to personal jurisdiction.

It may be that a larger firm can readily "alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *World-Wide Volkswagen, supra*, at 297. But manufacturers come in many shapes and sizes. It may be fundamentally unfair to require a small Egyptian shirt maker, a Brazilian manufacturing cooperative, or a Kenyan coffee farmer, selling its products through international distributors, to respond to products-liability tort suits in virtually every State in the United States, even those in respect to which the foreign firm has no connection at all but the sale of a single (allegedly defective) good. And a rule like the New Jersey Supreme Court suggests would require every product manufacturer, large or small, selling to American distributors to understand not only the tort law of every State, but also the wide variance in the way courts within different States apply that law. See, *e.g.,* Dept. of Justice, Bureau of Justice Statistics Bulletin, Tort Trials and Verdicts in Large Counties, 2001, p. 11 (reporting percentage of plaintiff winners in tort trials among 46 populous counties, ranging from 17.9% (Worcester, Mass.) to 69.1% (Milwaukee, Wis.)).

## C

At a minimum, I would not work such a change to the law in the way either the plurality or the New Jersey Supreme Court suggests without a better understanding of the relevant contemporary commercial circumstances. Insofar as such considerations are relevant to any change in present law, they might be presented in a case (unlike the present one) in which the Solicitor General participates. Cf. Tr. of Oral Arg. in *Goodyear Dunlop Tires Operations, S. A.* v. *Brown*, O. T. 2010, No. 10–76, pp. 20–22 (Government declining invitation at oral argument to give its views with respect to issues in this case).

This case presents no such occasion, and so I again reiterate that I would adhere strictly to our precedents and the limited facts found by the New Jersey Supreme Court. And on those grounds, I do not think we can find jurisdiction in this case. Accordingly, though I agree with the plurality as to the outcome of this case, I concur only in the judgment of that opinion and not its reasoning.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–1343

_____

## J. McINTYRE MACHINERY, LTD., PETITIONER *v.* ROBERT NICASTRO, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF ROSEANNE NICASTRO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NEW JERSEY

[June 27, 2011]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

A foreign industrialist seeks to develop a market in the United States for machines it manufactures. It hopes to derive substantial revenue from sales it makes to United States purchasers. Where in the United States buyers reside does not matter to this manufacturer. Its goal is simply to sell as much as it can, wherever it can. It excludes no region or State from the market it wishes to reach. But, all things considered, it prefers to avoid products liability litigation in the United States. To that end, it engages a U. S. distributor to ship its machines stateside. Has it succeeded in escaping personal jurisdiction in a State where one of its products is sold and causes injury or even death to a local user?

Under this Court's pathmarking precedent in *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), and subsequent decisions, one would expect the answer to be unequivocally, "No." But instead, six Justices of this Court, in divergent opinions, tell us that the manufacturer has avoided the jurisdiction of our state courts, except perhaps in States where its products are sold in sizeable quantities. Inconceivable as it may have seemed yester-

day, the splintered majority today "turn[s] the clock back
to the days before modern long-arm statutes when a
manufacturer, to avoid being haled into court where a user
is injured, need only Pilate-like wash its hands of a prod-
uct by having independent distributors market it." Wein-
traub, A Map Out of the Personal Jurisdiction Labyrinth,
28 U. C. Davis L. Rev. 531, 555 (1995).

I

On October 11, 2001, a three-ton metal shearing ma-
chine severed four fingers on Robert Nicastro's right hand.
*Nicastro* v. *McIntyre Machinery America, Ltd.*, 201 N. J.
48, 53, 987 A. 2d 575, 577 (2010); see App. 6a–8a (Com-
plaint). Alleging that the machine was a dangerous prod-
uct defectively made, Nicastro sought compensation from
the machine's manufacturer, J. McIntyre Machinery Ltd.
(McIntyre UK). Established in 1872 as a United Kingdom
corporation, and headquartered in Nottingham, England,
McIntyre UK "designs, develops and manufactures a com-
plete range of equipment for metal recycling." *Id.*, at
22a, 33a. The company's product line, as advertised on
McIntyre UK's Web site, includes "metal shears, balers,
cable and can recycling equipment, furnaces, casting equip-
ment and . . . the world's best aluminium dross process-
ing and cooling system." *Id.*, at 31a. McIntyre UK
holds both United States and European patents on its
technology. 201 N. J., at 55, 987 A. 2d, at 579; App. 36a.

The machine that injured Nicastro, a "McIntyre Model
640 Shear," sold in the United States for $24,900 in 1995,
*id.*, at 43a, and features a "massive cutting capacity," *id.*,
at 44a. According to McIntyre UK's product brochure, the
machine is "use[d] throughout the [w]orld." *Ibid*. McIn-
tyre UK represented in the brochure that, by "incorpo-
rat[ing] off-the-shelf hydraulic parts from suppliers with
international sales outlets," the 640 Shear's design guar-
antees serviceability "wherever [its customers] may be

based." *Ibid.* The instruction manual advises "owner[s] and operators of a 640 Shear [to] make themselves aware of [applicable health and safety regulations]," including "the American National Standards Institute Regulations (USA) for the use of Scrap Metal Processing Equipment." *Id.,* at 46a.

Nicastro operated the 640 Shear in the course of his employment at Curcio Scrap Metal (CSM) in Saddle Brook, New Jersey. *Id.*, at 7a, 43a. "New Jersey has long been a hotbed of scrap-metal businesses . . . ." See Drake, The Scrap-Heap Rollup Hits New Jersey, Business News New Jersey, June 1, 1998, p. 1. In 2008, New Jersey recycling facilities processed 2,013,730 tons of scrap iron, steel, aluminum, and other metals—more than any other State—outpacing Kentucky, its nearest competitor, by nearly 30 percent. Von Haaren, Themelis, & Goldstein, The State of Garbage in America, BioCycle, Oct. 2010, p. 19.

CSM's owner, Frank Curcio, "first heard of [McIntyre UK's] machine while attending an Institute of Scrap Metal Industries [(ISRI)] convention in Las Vegas in 1994 or 1995, where [McIntyre UK] was an exhibitor." App. 78a. ISRI "presents the world's largest scrap recycling industry trade show each year." *Id.*, at 47a. The event attracts "owners [and] managers of scrap processing companies" and others "interested in seeing—and purchasing—new equipment." *Id.*, at 48a–49a. According to ISRI, more than 3,000 potential buyers of scrap processing and recycling equipment attend its annual conventions, "primarily because th[e] exposition provides them with the most comprehensive industry-related shopping experience concentrated in a single, convenient location." *Id.*, at 47a. Exhibitors who are ISRI members pay $3,000 for 10' x 10' booth space. *Id.*, at 48a–49a.[1]

————————

[1] New Jersey is home to nearly 100 ISRI members. See Institute of

McIntyre UK representatives attended every ISRI convention from 1990 through 2005. *Id.*, at 114a–115a. These annual expositions were held in diverse venues across the United States; in addition to Las Vegas, conventions were held 1990–2005 in New Orleans, Orlando, San Antonio, and San Francisco. *Ibid.* McIntyre UK's president, Michael Pownall, regularly attended ISRI conventions. *Ibid.* He attended ISRI's Las Vegas convention the year CSM's owner first learned of, and saw, the 640 Shear. *Id.*, at 78a–79a, 115a. McIntyre UK exhibited its products at ISRI trade shows, the company acknowledged, hoping to reach "anyone interested in the machine from anywhere in the United States." *Id.,* at 161a.

Although McIntyre UK's U. S. sales figures are not in the record, it appears that for several years in the 1990's, earnings from sales of McIntyre UK products in the United States "ha[d] been good" in comparison to "the rest of the world." *Id.*, at 136a (Letter from Sally Johnson, McIntyre UK's Managing Director, to Gary and Mary Gaither, officers of McIntyre UK's exclusive distributor in the United States (Jan. 13, 1999)). In response to interrogatories, McIntyre UK stated that its commissioning engineer had installed the company's equipment in several States—Illinois, Iowa, Kentucky, Virginia, and Washington. *Id.*, at 119a.

From at least 1995 until 2001, McIntyre UK retained an Ohio-based company, McIntyre Machinery America, Ltd. (McIntyre America), "as its exclusive distributor for the entire United States." *Nicastro* v. *McIntyre Machinery America, Ltd.*, 399 N. J. Super. 539, 558, 945 A. 2d 92, 104 (App. 2008).[2] Though similarly named, the two companies

—————

Scrap Recycling Industries, Inc., Member Directory, http://www.isri.org/imis15_prod/core/directory.aspx (as visited June 24, 2011, and available in Clerk of Court's case file).

[2] McIntyre America filed for bankruptcy in 2001, is no longer operating, and has not participated in this lawsuit. Brief for Petitioner 3.

were separate and independent entities with "no commonality of ownership or management." *Id.,* at 545, 945 A. 2d, at 95. In invoices and other written communications, McIntyre America described itself as McIntyre UK's national distributor, "America's Link" to "Quality Metal Processing Equipment" from England. App. 43a, 78a.

In a November 23, 1999 letter to McIntyre America, McIntyre UK's president spoke plainly about the manufacturer's objective in authorizing the exclusive distributorship: "All we wish to do is sell our products in the [United] States—and get paid!" *Id.,* at 134a. Notably, McIntyre America was concerned about U. S. litigation involving McIntyre UK products, in which the distributor had been named as a defendant. McIntyre UK counseled McIntyre America to respond personally to the litigation, but reassured its distributor that "the product was built and designed by McIntyre Machinery in the UK and the buck stops here—if there's something wrong with the machine." *Id.,* at 129a–130a. Answering jurisdictional interrogatories, McIntyre UK stated that it had been named as a defendant in lawsuits in Illinois, Kentucky, Massachusetts, and West Virginia. *Id.,* at 98a, 108a. And in correspondence with McIntyre America, McIntyre UK noted that the manufacturer had products liability insurance coverage. *Id.,* at 129a.

Over the years, McIntyre America distributed several McIntyre UK products to U. S. customers, including, in addition to the 640 Shear, McIntyre UK's "Niagara" and "Tardis" systems, wire strippers, and can machines. *Id.,* at 123a–128a. In promoting McIntyre UK's products at conventions and demonstration sites and in trade journal advertisements, McIntyre America looked to McIntyre UK

---

After "the demise of . . . McIntyre America," McIntyre UK authorized a Texas-based company to serve as exclusive United States distributor of McIntyre UK shears. App. 52a–53a.

for direction and guidance. *Ibid.* To achieve McIntyre UK's objective, *i.e.*, "to sell [its] machines to customers throughout the United States," 399 N. J. Super., at 548, 945 A. 2d, at 97, "the two companies [were acting] closely in concert with each other," *ibid.* McIntyre UK never instructed its distributor to avoid certain States or regions of the country; rather, as just noted, the manufacturer engaged McIntyre America to attract customers "from anywhere in the United States." App. 161a.

In sum, McIntyre UK's regular attendance and exhibitions at ISRI conventions was surely a purposeful step to reach customers for its products "anywhere in the United States." At least as purposeful was McIntyre UK's engagement of McIntyre America as the conduit for sales of McIntyre UK's machines to buyers "throughout the United States." Given McIntyre UK's endeavors to reach and profit from the United States market as a whole, Nicastro's suit, I would hold, has been brought in a forum entirely appropriate for the adjudication of his claim. He alleges that McIntyre UK's shear machine was defectively designed or manufactured and, as a result, caused injury to him at his workplace. The machine arrived in Nicastro's New Jersey workplace not randomly or fortuitously, but as a result of the U. S. connections and distribution system that McIntyre UK deliberately arranged.[3] On

----

[3] McIntyre UK resisted Nicastro's efforts to determine whether other McIntyre machines had been sold to New Jersey customers. See *id.,* at 100a–101a. McIntyre did allow that McIntyre America "may have resold products it purchased from [McIntyre UK] to a buyer in New Jersey," *id.*, at 117a, but said it kept no record of the ultimate destination of machines it shipped to its distributor, *ibid.* A private investigator engaged by Nicastro found at least one McIntyre UK machine, of unspecified type, in use in New Jersey. *Id.*, at 140a–144a. But McIntyre UK objected that the investigator's report was "unsworn and based upon hearsay." Reply Brief 10. Moreover, McIntyre UK maintained, no evidence showed that the machine the investigator found in New Jersey had been "sold into [that State]." *Ibid.*

what sensible view of the allocation of adjudicatory authority could the place of Nicastro's injury within the United States be deemed off limits for his products liability claim against a foreign manufacturer who targeted the United States (including all the States that constitute the Nation) as the territory it sought to develop?

## II

A few points on which there should be no genuine debate bear statement at the outset. First, all agree, McIntyre UK surely is not subject to general (all-purpose) jurisdiction in New Jersey courts, for that foreign-country corporation is hardly "at home" in New Jersey. See *Goodyear Dunlop Tires Operations, S. A.* v. *Brown, post,* at 2–3, 9–13. The question, rather, is one of specific jurisdiction, which turns on an "affiliatio[n] between the forum and the underlying controversy." *Goodyear Dunlop, post,* at 2 (quoting von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1136 (1966) (hereinafter von Mehren & Trautman); internal quotation marks omitted); see also *Goodyear Dunlop, post,* at 7–8.

Second, no issue of the fair and reasonable allocation of adjudicatory authority among States of the United States is present in this case. New Jersey's exercise of personal jurisdiction over a foreign manufacturer whose dangerous product caused a workplace injury in New Jersey does not tread on the domain, or diminish the sovereignty, of any sister State. Indeed, among States of the United States, the State in which the injury occurred would seem most suitable for litigation of a products liability tort claim. See *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 297 (1980) (if a manufacturer or distributor endeavors to develop a market for a product in several States, it is reasonable "to subject it to suit in one of those States if its allegedly defective [product] has there been the source of

injury"); 28 U. S. C. §1391(a)–(b) (in federal-court suits, whether resting on diversity or federal-question jurisdiction, venue is proper in the judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred").

Third, the constitutional limits on a state court's adjudicatory authority derive from considerations of due process, not state sovereignty. As the Court clarified in *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694 (1982):

> "The restriction on state sovereign power described in *World-Wide Volkswagen Corp.* . . . must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause. That Clause is the only source of the personal jurisdiction requirement and the Clause itself makes no mention of federalism concerns. Furthermore, if the federalism concept operated as an independent restriction on the sovereign power of the court, it would not be possible to waive the personal jurisdiction requirement: Individual actions cannot change the powers of sovereignty, although the individual can subject himself to powers from which he may otherwise be protected." *Id.*, at 703, n. 10.

See also *Shaffer* v. *Heitner*, 433 U. S. 186, 204, and n. 20 (1977) (recognizing that "the mutually exclusive sovereignty of the States [is not] the central concern of the inquiry into personal jurisdiction"). But see *ante*, at 7 (plurality opinion) (asserting that "sovereign authority," not "fairness," is the "central concept" in determining personal jurisdiction).

Finally, in *International Shoe* itself, and decisions thereafter, the Court has made plain that legal fictions, notably "presence" and "implied consent," should be discarded, for they conceal the actual bases on which jurisdiction rests.

See 326 U. S., at 316, 318; *Hutchinson* v. *Chase & Gilbert*, 45 F. 2d 139, 141 (CA2 1930) (L. Hand, J.) ("nothing is gained by [resort to words that] concea[l] what we do"). "[T]he relationship among the defendant, the forum, and the litigation" determines whether due process permits the exercise of personal jurisdiction over a defendant, *Shaffer*, 433 U. S., at 204, and "fictions of implied consent" or "corporate presence" do not advance the proper inquiry, *id.*, at 202. See also *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 618 (1990) (plurality opinion) (*International Shoe* "cast . . . aside" fictions of "consent" and "presence").

Whatever the state of academic debate over the role of consent in modern jurisdictional doctrines,[4] the plurality's notion that consent is the animating concept draws no support from controlling decisions of this Court. Quite the contrary, the Court has explained, a forum can exercise jurisdiction when its contacts with the controversy are sufficient; invocation of a fictitious consent, the Court has repeatedly said, is unnecessary and unhelpful. See, *e.g.*, *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 472 (1985) (Due Process Clause permits "forum . . . to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there"); *McGee* v. *International Life Ins.*

---

[4] Compare Brilmayer, Rights, Fairness, and Choice of Law, 98 Yale L. J. 1277, 1304–1306 (1989) (hereinafter Brilmayer) (criticizing as circular jurisdictional theories founded on "consent" or "[s]ubmission to state authority"), Perdue, Personal Jurisdiction and the Beetle in the Box, 32 Boston College L. Rev. 529, 536–544 (1991) (same), with Trangsrud, The Federal Common Law of Personal Jurisdiction, 57 Geo. Wash. L. Rev. 849, 884–885 (1989) (endorsing a consent-based doctrine of personal jurisdiction), Epstein, Consent, Not Power, as the Basis of Jurisdiction, 2001 U. Chi. Legal Forum 1, 2, 30–32 (urging that "the consent principle neatly explains the dynamics of many of our jurisdictional doctrines," but recognizing that in tort cases, the victim ordinarily should be able to sue in the place where the harm occurred).

*Co.*, 355 U. S. 220, 222 (1957) ("[T]his Court [has] abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over [out-of-state] corporations.").[5]

### III

This case is illustrative of marketing arrangements for sales in the United States common in today's commercial world.[6] A foreign-country manufacturer engages a U. S. company to promote and distribute the manufacturer's products, not in any particular State, but anywhere and everywhere in the United States the distributor can attract purchasers. The product proves defective and injures a user in the State where the user lives or works. Often, as here, the manufacturer will have liability insurance covering personal injuries caused by its products. See Cupp, Redesigning Successor Liability, 1999 U. Ill. L. Rev. 845, 870–871 (noting the ready availability of products liability insurance for manufacturers and citing a study showing, "between 1986 and 1996, [such] insurance

_____

[5] But see *ante*, at 4–8 (plurality opinion) (maintaining that a forum may be fair and reasonable, based on its links to the episode in suit, yet off limits because the defendant has not submitted to the State's authority). The plurality's notion that jurisdiction over foreign corporations depends upon the defendant's "submission," *ante*, at 6, seems scarcely different from the long-discredited fiction of implied consent. It bears emphasis that a majority of this Court's members do not share the plurality's view.

[6] Last year, the United States imported nearly 2 trillion dollars in foreign goods. Census Bureau, U. S. International Trade in Goods and Services (Apr. 2011), p. 1, http://www.census.gov/foreign-trade/Press-Release/current_press_release/ft900.pdf (as visited June 24, 2011, and in Clerk of Court's case file). Capital goods, such as the metal shear machine that injured Nicastro, accounted for almost 450 billion dollars in imports for 2010. *Id.*, at 6. New Jersey is the fourth-largest destination for manufactured commodities imported into the United States, after California, Texas, and New York. *Id.*, FT–900 Supplement, p. 3.

cost manufacturers, on average, only sixteen cents for each $100 of product sales"); App. 129–130.

When industrial accidents happen, a long-arm statute in the State where the injury occurs generally permits assertion of jurisdiction, upon giving proper notice, over the foreign manufacturer. For example, the State's statute might provide, as does New York's long-arm statute, for the "exercise [of] personal jurisdiction over any non-domiciliary . . . who . . .

> "commits a tortious act without the state causing injury to person or property within the state, . . . if he . . . expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N. Y. Civ. Prac. Law Ann. §302(a)(3)(ii) (West 2008).[7]

Or, the State might simply provide, as New Jersey does, for the exercise of jurisdiction "consistent with due process of law." N. J. Ct. Rule 4:4–4(b)(1) (2011).[8]

The modern approach to jurisdiction over corporations and other legal entities, ushered in by *International Shoe*, gave prime place to reason and fairness. Is it not fair and reasonable, given the mode of trading of which this case is

_____

[7]This provision was modeled in part on the Uniform Interstate and International Procedure Act. See N. Y. Legislative Doc. 90, Judicial Conference of the State of New York, 11th Annual Report 132–147 (1966). Connecticut's long-arm statute also uses the "derives substantial revenue from interstate or international commerce" formulation. See Conn. Gen. Stat. §52–59b(a) (2011).

[8]State long-arm provisions allow the exercise of jurisdiction subject only to a due process limitation in Alabama, Arkansas, California, Colorado, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Nevada, North Dakota, Oregon, Pennsylvania, Puerto Rico, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, and West Virginia. 4 C. Wright & A. Miller, Federal Practice & Procedure §1068, pp. 577–578, n. 12 (3d ed. 2002).

an example, to require the international seller to defend at the place its products cause injury?[9]  Do not litigational convenience[10] and choice-of-law considerations[11] point in that direction?  On what measure of reason and fairness can it be considered undue to require McIntyre UK to defend in New Jersey as an incident of its efforts to develop a market for its industrial machines anywhere and everywhere in the United States?[12]  Is not the burden on McIntyre UK to defend in New Jersey fair, *i.e.*, a reasonable cost of transacting business internationally, in comparison to the burden on Nicastro to go to Nottingham, England to gain recompense for an injury he sustained using McIntyre's product at his workplace in Saddle Brook, New Jersey?

––––––––––

[9] The plurality objects to a jurisdictional approach "divorced from traditional practice."  *Ante*, at 5.  But "the fundamental transformation of our national economy," this Court has recognized, warrants enlargement of "the permissible scope of state jurisdiction over foreign corporations and other nonresidents."  *McGee* v. *International Life Ins. Co.*, 355 U. S. 220, 222–223 (1957).

[10] See von Mehren & Trautman 1167 ("[C]onsiderations of litigational convenience, particularly with respect to the taking of evidence, tend in accident cases to point insistently to the community in which the accident occurred.").

[11] Historically, "tort cases were governed by the place where the last act giving rise to a claim occurred—that is, the place of injury."  Brilmayer 1291–1292.  Even as many jurisdictions have modified the traditional rule of *lex loci delicti*, the location of injury continues to hold sway in choice-of-law analysis in tort cases.  See generally Whytock, Myth of Mess? International Choice of Law in Action, 84 N. Y. U. L. Rev. 719 (2009).

[12] The plurality suggests that the Due Process Clause might permit a federal district court in New Jersey, sitting in diversity and applying New Jersey law, to adjudicate McIntyre UK's liability to Nicastro.  See *ante*, at 10–11.  In other words, McIntyre UK might be compelled to bear the burden of traveling to New Jersey and defending itself there under New Jersey's products liability law, but would be entitled to federal adjudication of Nicastro's state-law claim.  I see no basis in the Due Process Clause for such a curious limitation.

McIntyre UK dealt with the United States as a single market. Like most foreign manufacturers, it was concerned not with the prospect of suit in State X as opposed to State Y, but rather with its subjection to suit anywhere in the United States. See Hay, Judicial Jurisdiction Over Foreign-Country Corporate Defendants—Comments on Recent Case Law, 63 Ore. L. Rev. 431, 433 (1984) (hereinafter Hay). As a McIntyre UK officer wrote in an e-mail to McIntyre America: "American law—who needs it?!" App. 129a–130a (e-mail dated April 26, 1999 from Sally Johnson to Mary Gaither). If McIntyre UK is answerable in the United States at all, is it not "perfectly appropriate to permit the exercise of that jurisdiction . . . at the place of injury"? See Hay 435; Degnan & Kane, The Exercise of Jurisdiction Over and Enforcement of Judgments Against Alien Defendants, 39 Hastings L. J. 799, 813–815 (1988) (noting that "[i]n the international order," the State that counts is the United States, not its component States,[13] and that the fair place of suit within the United States is essentially a question of venue).

In sum, McIntyre UK, by engaging McIntyre America to promote and sell its machines in the United States, "purposefully availed itself" of the United States market nationwide, not a market in a single State or a discrete collection of States. McIntyre UK thereby availed itself of

---

[13] "For purposes of international law and foreign relations, the separate identities of individual states of the Union are generally irrelevant." Born, Reflections on Judicial Jurisdiction in International Cases, 17 Ga. J. Int'l & Comp. L. 1, 36 (1987). See also *Hines* v. *Davidowitz*, 312 U. S. 52, 63 (1941) ("For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power.") (internal quotation marks omitted); Restatement (Third) of Foreign Relations Law of the United States §421, Comment *f,* p. 307 (1986) ("International law . . . does not concern itself with the allocation of jurisdiction among domestic courts within a [nation,] for example, between national and local courts in a federal system.").

the market of all States in which its products were sold by its exclusive distributor. "Th[e] 'purposeful availment' requirement," this Court has explained, simply "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King*, 471 U. S., at 475. Adjudicatory authority is appropriately exercised where "actions by the defendant *himself*" give rise to the affiliation with the forum. *Ibid.* How could McIntyre UK not have intended, by its actions targeting a national market, to sell products in the fourth largest destination for imports among all States of the United States and the largest scrap metal market? See *supra*, at 3, 10, n. 6. But see *ante*, at 11 (plurality opinion) (manufacturer's purposeful efforts to sell its products nationwide are "not . . . relevant" to the personal jurisdiction inquiry).

Courts, both state and federal, confronting facts similar to those here, have rightly rejected the conclusion that a manufacturer selling its products across the USA may evade jurisdiction in any and all States, including the State where its defective product is distributed and causes injury. They have held, instead, that it would undermine principles of fundamental fairness to insulate the foreign manufacturer from accountability in court at the place within the United States where the manufacturer's products caused injury. See, *e.g.*, *Tobin* v. *Astra Pharmaceutical Prods., Inc.*, 993 F. 2d 528, 544 (CA6 1993); *A. Uberti & C.* v. *Leonardo*, 181 Ariz. 565, 573, 892 P. 2d 1354, 1362 (1995).[14]

## IV
## A

While this Court has not considered in any prior case the now-prevalent pattern presented here—a foreign-

---

[14] For a more complete set of examples, see Appendix, *infra*, at 20–24.

country manufacturer enlisting a U. S. distributor to develop a market in the United States for the manufacturer's products—none of the Court's decisions tug against the judgment made by the New Jersey Supreme Court. McIntyre contends otherwise, citing *World-Wide Volkswagen*, and *Asahi Metal Industry Co.* v. *Superior Court of Cal., Solano Cty.*, 480 U. S. 102 (1987).

*World-Wide Volkswagen* concerned a New York car dealership that sold solely in the New York market, and a New York distributor who supplied retailers in three States only: New York, Connecticut, and New Jersey. 444 U. S., at 289. New York residents had purchased an Audi from the New York dealer and were driving the new vehicle through Oklahoma en route to Arizona. On the road in Oklahoma, another car struck the Audi in the rear, causing a fire which severely burned the Audi's occupants. *Id.*, at 288. Rejecting the Oklahoma courts' assertion of jurisdiction over the New York dealer and distributor, this Court observed that the defendants had done nothing to serve the market for cars in Oklahoma. *Id.*, at 295–298. Jurisdiction, the Court held, could not be based on the *customer's* unilateral act of driving the vehicle to Oklahoma. *Id.*, at 298; see *Asahi*, 480 U. S., at 109 (opinion of O'Connor, J.) (*World-Wide Volkswagen* "rejected the assertion that a *consumer's* unilateral act of bringing the defendant's product into the forum State was a sufficient constitutional basis for personal jurisdiction over the defendant").

Notably, the foreign manufacturer of the Audi in *World-Wide Volkswagen* did not object to the jurisdiction of the Oklahoma courts and the U. S. importer abandoned its initially stated objection. 444 U. S., at 288, and n. 3. And most relevant here, the Court's opinion indicates that an objection to jurisdiction by the manufacturer or national distributor would have been unavailing. To reiterate, the Court said in *World-Wide Volkswagen* that, when a manu-

facturer or distributor aims to sell its product to customers in several States, it is reasonable "to subject it to suit in [any] one of those States if its allegedly defective [product] has there been the source of injury." *Id.*, at 297.

*Asahi* arose out of a motorcycle accident in California. Plaintiff, a California resident injured in the accident, sued the Taiwanese manufacturer of the motorcycle's tire tubes, claiming that defects in its product caused the accident. The tube manufacturer cross-claimed against Asahi, the Japanese maker of the valve assembly, and Asahi contested the California courts' jurisdiction. By the time the case reached this Court, the injured plaintiff had settled his case and only the indemnity claim by the Taiwanese company against the Japanese valve-assembly manufacturer remained.

The decision was not a close call. The Court had before it a foreign plaintiff, the Taiwanese manufacturer, and a foreign defendant, the Japanese valve-assembly maker, and the indemnification dispute concerned a transaction between those parties that occurred abroad. All agreed on the bottom line: The Japanese valve-assembly manufacturer was not reasonably brought into the California courts to litigate a dispute with another foreign party over a transaction that took place outside the United States.

Given the confines of the controversy, the dueling opinions of Justice Brennan and Justice O'Connor were hardly necessary. How the Court would have "estimate[d] . . . the inconveniences," see *International Shoe*, 326 U. S., at 317 (internal quotation marks omitted), had the injured Californian originally sued Asahi is a debatable question. Would this Court have given the same weight to the burdens on the foreign defendant had those been counterbalanced by the burdens litigating in Japan imposed on the local California plaintiff? Cf. *Calder* v. *Jones*, 465 U. S. 783, 788 (1984) (a plaintiff's contacts with the forum "may be so manifold as to permit jurisdiction when it would not

exist in their absence").

In any event, Asahi, unlike McIntyre UK, did not itself seek out customers in the United States, it engaged no distributor to promote its wares here, it appeared at no tradeshows in the United States, and, of course, it had no Web site advertising its products to the world.  Moreover, Asahi was a component-part manufacturer with "little control over the final destination of its products once they were delivered into the stream of commerce."  *A. Uberti*, 181 Ariz., at 572, 892 P. 2d, at 1361.  It was important to the Court in *Asahi* that "those who use Asahi components in their final products, and sell those products in California, [would be] subject to the application of California tort law."  480 U. S., at 115 (majority opinion).  To hold that *Asahi* controls this case would, to put it bluntly, be dead wrong.[15]

B

The Court's judgment also puts United States plaintiffs at a disadvantage in comparison to similarly situated complainants elsewhere in the world.  Of particular note, within the European Union, in which the United Kingdom is a participant, the jurisdiction New Jersey would have exercised is not at all exceptional.  The European Regulation on Jurisdiction and the Recognition and Enforcement of Judgments provides for the exercise of specific jurisdiction "in matters relating to tort . . . in the courts for the place where the harmful event occurred."  Council Reg.

---

[15] The plurality notes the low volume of sales in New Jersey, *ante*, at 3, 11.  A $24,900 shearing machine, however, is unlikely to sell in bulk worldwide, much less in any given State.  By dollar value, the price of a single machine represents a significant sale.  Had a manufacturer sold in New Jersey $24,900 worth of flannel shirts, see *Nelson* v. *Park Industries, Inc.*, 717 F. 2d 1120 (CA7 1983), cigarette lighters, see *Oswalt* v. *Scripto, Inc.*, 616 F. 2d 191 (CA5 1980), or wire-rope splices, see *Hedrick* v. *Daiko Shoji Co.*, 715 F. 2d 1355 (CA9 1983), the Court would presumably find the defendant amenable to suit in that State.

44/2001, Art. 5, 2001 O. J. (L. 12) 4.[16]   The European
Court of Justice has interpreted this prescription to au-
thorize jurisdiction either where the harmful act occurred
or at the place of injury.  See *Handelskwekerij G. J. Bier
B. V.* v. *Mines de Potasse d'Alsace S. A.,* 1976 E. C. R.
1735, 1748–1749.[17]

V

   The commentators who gave names to what we now
call "general jurisdiction" and "specific jurisdiction" antici-
pated that when the latter achieves its full growth, con-
siderations of litigational convenience and the respective
situations of the parties would determine when it is ap-
propriate to subject a defendant to trial in the plaintiff's
community.   See von Mehren & Trautman 1166–1179.
Litigational considerations include "the convenience of
witnesses and the ease of ascertaining the governing law."
*Id.*, at 1168–1169.  As to the parties, courts would differ-
ently appraise two situations: (1) cases involving a sub-
stantially local plaintiff, like Nicastro, injured by the
activity of a defendant engaged in interstate or interna-
tional trade; and (2) cases in which the defendant is a
natural or legal person whose economic activities and legal
involvements are largely home-based, *i.e.*, entities without
designs to gain substantial revenue from sales in distant
markets.  See *id.*, at 1167–1169.[18]  As the attached appen-

_____

   [16]The Regulation replaced the "European" or "Brussels" Convention
on Jurisdiction and Enforcement of Judgments in Civil and Commercial
Matters, entered into in 1968 by the original Common Market member
states.  In the interim, the Lugano Convention "extended the Brussels
Convention scheme to [European Free Trade Association] countries."
Clermont & Palmer, Exorbitant Jurisdiction, 58 Me. L. Rev. 474, 491,
n. 82 (2006).
   [17]For a concise comparison of the European regime and this Court's
decisions, see Weintraub, A Map Out of the Personal Jurisdiction
Labyrinth, 28 U. C. Davis L. Rev. 531, 550–554 (1995).
   [18]Assigning weight to the local or international stage on which the

dix of illustrative cases indicates, courts presented with von Mehren and Trautman's first scenario—a local plaintiff injured by the activity of a manufacturer seeking to exploit a multistate or global market—have repeatedly confirmed that jurisdiction is appropriately exercised by courts of the place where the product was sold and caused injury.

\*    \*    \*

For the reasons stated, I would hold McIntyre UK answerable in New Jersey for the harm Nicastro suffered at his workplace in that State using McIntyre UK's shearing machine. While I dissent from the Court's judgment, I take heart that the plurality opinion does not speak for the Court, for that opinion would take a giant step away from the "notions of fair play and substantial justice" underlying *International Shoe*. 326 U. S., at 316 (internal quotation marks omitted).

_____

parties operate would, to a considerable extent, answer the concerns expressed by JUSTICE BREYER. See *ante*, at 5–7 (opinion concurring in judgment).

## APPENDIX

Illustrative cases upholding exercise of personal jurisdiction over an alien or out-of-state corporation that, through a distributor, targeted a national market, including any and all States:[19]

*Clune* v. *Alimak AB*, 233 F. 3d 538, 544 (CA8 2000) (wrongful-death action against the Swedish manufacturer of a construction hoist that allegedly caused a workplace death in Missouri; holding the manufacturer amenable to suit in Missouri, the Eighth Circuit stated: "Although we can imagine a case where a foreign manufacturer selects discrete regional distributors for the purpose of penetrating the markets in some states to the exclusion of others, that situation is not before us." In this case, the foreign manufacturer had "successfully employ[ed] one or two distributors to cover the [entire] United States[,] intend[ing] to reap the benefit of sales in every state where those distributors market." Were the court to conclude that the manufacturer "did not intend its products to flow into Missouri," the court "would be bound to the conclusion that the [manufacturer] did not intend its products to flow into *any* of the United States.").

*Kernan* v. *Kurz-Hastings, Inc.*, 175 F. 3d 236, 242–244 (CA2 1999) (products liability action against the Japanese manufacturer of an allegedly defective stamping press that caused a workplace injury in New York; holding the manufacturer amenable to suit in New York, the Second Circuit stated that an "exclusive sales rights agreement" between the Japanese manufacturer and a Pennsylvania distributor "contemplates that [the distributor] will sell

---

[19] The listed cases are by no means exhaustive of decisions fitting this pattern. For additional citations, see Brief for Public Citizen, Inc., as *Amicus Curiae* 16, n. 5.

[the manufacturer's] machines in North America and throughout the world, serv[ing] as evidence of [the manufacturer's] attempt to serve the New York market, albeit indirectly").

*Barone* v. *Rich Bros. Interstate Display Fireworks Co.*, 25 F. 3d 610, 613–615 (CA8 1994) (products liability suit against a Japanese fireworks manufacturer for injuries sustained in Nebraska; Eighth Circuit held the manufacturer amenable to suit in Nebraska, although the manufacturer had no distributor or sales agents in that State, did not advertise in Nebraska, and claimed it was unaware that its distributors sold products there; Court of Appeals stated: "In this age of NAFTA and GATT, one can expect further globalization of commerce, and it is only reasonable for companies that distribute allegedly defective products through regional distributors in this country to anticipate being haled into court by plaintiffs in their home states.").

*Tobin* v. *Astra Pharmaceutical Prods., Inc.*, 993 F. 2d 528, 544 (CA6 1993) (products liability action against the Dutch pharmaceutical manufacturer of a drug alleged to have caused Kentucky resident's heart disease; holding the manufacturer amenable to suit in Kentucky, the Sixth Circuit reasoned: "[Defendant] argues that it has done nothing in particular to purposefully avail itself of the Kentucky market as distinguished from any other state in the union. If we were to accept defendant's argument on this point, a foreign manufacturer could insulate itself from liability in each of the fifty states simply by using an independent national distributor to market its products.").

*Hedrick* v. *Daiko Shoji Co.*, 715 F. 2d 1355, 1358 (CA9 1983) (products liability suit arising from injuries plaintiff sustained in Oregon caused by an allegedly defective wire-

rope splice manufactured in Japan; holding the Japanese manufacturer amenable to suit in Oregon, the Ninth Circuit noted that the manufacturer "performed a forum-related act when it produced a splice that it knew was destined for ocean-going vessels serving United States ports, including those of Oregon").

*Oswalt* v. *Scripto, Inc.*, 616 F. 2d 191, 200 (CA5 1980) (products liability action stemming from an injury plaintiff sustained in Texas when using a cigarette lighter made in Japan; holding the manufacturer amenable to suit in Texas, the Fifth Circuit noted that the manufacturer "had every reason to believe its product would be sold to a nation-wide market, that is, in any or all states").

*Stokes* v. *L. Geismar, S.A.*, 815 F. Supp. 904, 907 (ED Va. 1993), aff'd on other grounds, 16 F. 3d 411 (CA4 1994) (action by worker injured in Virginia while using a rail-cutting saw manufactured by a French corporation; holding the manufacturer amenable to suit in Virginia, the District Court noted that there was "no evidence of any attempt . . . to limit th[e] U. S. marketing strategy to avoid Virginia or any other particular state").

*Felty* v. *Conaway Processing Equipment Co.*, 738 F. Supp. 917, 919–920 (ED Pa. 1990) (personal injury suit against the Dutch manufacturer of a poultry processing machine that allegedly caused injury in Pennsylvania; holding the manufacturer amenable to suit in Pennsylvania, the District Court observed that the manufacturer "clearly and purposefully used [distributors] to deal in the international market for poultry processing equipment" and was "well aware that its equipment was being sold for use in the United States, including Pennsylvania").

*Scanlan* v. *Norma Projektil Fabrik*, 345 F. Supp. 292,

293 (Mont. 1972) (products liability action occasioned by defect in ammunition used while hunting in Montana; plaintiff sued the Swedish ammunition manufacturer; holding the manufacturer amenable to suit in Montana, the District Court noted that the distributor intended "a nationwide product distribution").

*Ex parte DBI, Inc.*, 23 So. 3d 635, 654–655 (Ala. 2009) (wrongful-death action arising out of an automobile accident in Alabama; plaintiff sued the Korean manufacturer of an allegedly defective seatbelt; Supreme Court of Alabama held the manufacturer amenable to suit in Alabama, although the manufacturer had supplied its seatbelts to the car maker in Korea and "maintain[ed] there [was] no evidence . . . showing that it knew its products were being marketed in Alabama").

*A. Uberti & C.* v. *Leonardo*, 181 Ariz. 565, 573, 892 P. 2d 1354, 1362 (1995) (wrongful-death action against the Italian manufacturer of an allegedly defective handgun that caused child's death in Arizona; Arizona Supreme Court stated: "[F]or all this record shows, Defendant never heard of Arizona.  This raises the following question: Having shown that the gun was knowingly designed for and exported to exploit the market of the United States or western United States, must Plaintiffs additionally show that Defendant had the specific intent to market the gun in Arizona, or is it enough to show that Defendant intended to market it in any state, group of states, or all states?  We conclude that only the latter is necessary.").

*Hill by Hill* v. *Showa Denko, K. K.*, 188 W. Va. 654, 661, 425 S. E. 2d 609, 616 (1992) (products liability suit against the Japanese manufacturer of a sleep aid alleged to have caused West Virginia plaintiff's blood disorder; holding the manufacturer amenable to suit in West Virginia, that

State's Supreme Court noted that the manufacturer had profited from sales in the United States and considered it unfair to "requir[e] the plaintiff to travel to Japan to litigate th[e] case").